PHILIP REYBOLD *vs.* ELIHU JEFFERSON, adm'r. of JOB S. DODD, deceased.

ELIHU JEFFERSON, adm'r. of JOB S. DODD, deceased, *vs.* PHILIP REYBOLD.

The chancellor has not the power to appoint a *master in chancery.*

On a bill for an account of partnership transactions an interlocutory decree to account is decisive of the *existence* of a partnership, but not of its *extent* or *terms.*

If a partnership be established it is *prima facie* one of equal interests.

The court will not decree a division of subsequent profits after the dissolution of a partnership merely because the withdrawing partner's share of the profits already accrued are not paid over to him.

One partner is not entitled to compensation for his attention to the business without a special contract to that effect.

The chancellor may direct an issue to a court of law at any time before final hearing.

APPEALS from the decree of the chancellor. Newcastle.

Mr. Black did not sit having been of counsel below.

The bill was filed in 1826 by Job S. Dodd, for an account of partnership transactions between him and Philip Reybold in the business of buying and butchering cattle, sheep and other stock for sale. The answer totally denied that any such partnership had ever existed; and, on the hearing at the July term, to wit, the 7th of July, 1828, the chancellor (Ridgely) decreed "that Philip Reybold the deft. aforesaid, shall come to a full, fair, true and particular account with the said complainant Job S. Dodd, for all the property, effects, rights and credits of the said concern; and of all the profits made by or on account or in behalf of the said concern, and of all transactions since the commencement of the said concern as aforesaid, touching the same, and exhibiting the true balance due to the said complainant from the said concern, and on or before the fifteenth day of October next, shall file an account in this court, in which he shall set forth and discover a just, full, true and perfect account of all the business and transactions of the said concern of Philip Reybold and Job S. Dodd, from its establishment up to the seventh day of the present month of July, "with liberty to the complainant to except, and a reservation to the chancellor to make such other and final order and decree in the premises as he may deem just and equitable."

An appeal was taken by Reybold from this interlocutory decree of the chancellor to the late High Court of Errors and Appeals; which court, at the June term, 1829, *affirmed* the said decree of the chancellor "in all respects" and remanded the record to the court below.

The said accounts having been filed and excepted to, and additional accounts ordered and filed and excepted to, and depositions taken on both sides; and the depositions having been read to the chancellor, on the 15th of March, A. D. 1830, the defendant's solicitor moved the court for an order that the following issues of fact be tried at law, to wit: "whether or not the partnership in the business of slaughtering cattle, sheep and hogs between the said Job S. Dodd and the said Philip Reybold has been dissolved? and, if dissolved, when was the said partnership dissolved? which order the chancellor *refused* to make. Further accounts having been filed under the orders of the chancellor and excepted to, and depositions taken; on the 9th of March, 1831, the cause came on to be heard before the chancellor upon the exceptions filed, the depositions having been in part read, it was "ordered, adjudged and decreed by the chancellor, that the accounts and exceptions, together with the depositions filed in this cause, be referred to William P. Brobson to take and state, settle and adjust an account between the parties complainant and defendant touching and concerning the concerns and business of the partnership heretofore subsisting between them and mentioned in the pleadings in this cause, on or before the first day of July next, (setting forth, &c. showing, &c.) and exhibiting the true balance due to the said complainant from the said concern; and that either party may be at liberty to file exceptions to the said account; and that either party may be at liberty to prove any matter or thing in relation to the said account, by depositions taken in the usual form; and that the said William P. Brobson have power to examine witnesses

touching the several matters above mentioned or any of them; and that the said William P. Brobson have power to compel the production of books, papers and documents, or other writing as may be in possession or power of either of the parties which he shall think ought to be produced in taking said account."

The account stated by Mr. Brobson having been returned with a report explanatory of the same, and with the depositions taken by him; exceptions on both sides were taken to the said account and rule commissions on both sides "February 16, 1832, the exceptions filed to the accounts in this cause coming on to be heard on this day, and on the 17th, 18th and 20th, the allegations, exhibits and proofs being examined and considered and debated by counsel on the 20th, the counsel for the deft. moved that the following feigned issue be directed to be tried at law, viz: "whether the said Job S. Dodd and Philip Reybold were or were not partners in the butchering business; if they were partners, what was the interest of each partner in the firm, and how long the said partnership continued? The counsel for the complainant opposing the directing a feigned issue or issues. Whereupon, this 21st day of February, A. D. 1832, the chancellor considering that in this stage of the cause the deft. was not entitled, on his motion, to an order for a feigned issue, refused to direct the same, reserving to himself the right hereafter to direct an issue or issues, if he should be of opinion it would be necessary so to do for his information, and the counsel were ordered to proceed with the further debating of the said exceptions. And now to wit, this fifth day of April, A. D. 1832. It is ordered by the chancellor that a feigned issue be formed and tried in the ordinary manner between the above parties by a jury of Newcastle county, at the bar of the Superior court, in Newcastle county, at the next or any subsequent term of the said court, to inquire, ascertain and determine whether or not the partnership in the business of slaughtering cattle, sheep and hogs between the said Job S. Dodd and the said Philip Reybold has been dissolved? and if dissolved when was the said partnership dissolved?"

Upon this issue it was found "that the partnership in the business of slaughtering cattle, sheep and hogs between the said Job S. Dodd and the said Philip Reybold has been dissolved; and that the said partnership was dissolved on the sixth day of July, A. D. 1826."

The cause came on for final hearing on the 15th September, 1832, and the chancellor, after sundry alterations and charges in the account stated by William P. Brobson, made his final decree on the 25th of February, 1833, that the deft. pay to complainant the sum of $1227 23, being the moiety of the profits of the concern on the sixth July, 1826, together with the sum of $488 62, interest on the said sum from that date, making together the sum of $1715 85; and that the deft. pay costs, &c.

Whereupon, an appeal was prayed by both sides and granted.

*Mr. Gray* on the part of Dodd's adm'r. We object to the decree of the chancellor; first. Because it varies from and violates the decree of the 7th of July, 1828, as affirmed in the High Court of Errors and Appeals. That decree established not only the existence of a partnership, but its duration up to the date of the decree. If this

was wrong the defts. remedy was by petition for rehearing before the chancellor himself or by appeal. He took the latter course and he is now concluded. The issue afterwards sent to law for the purpose of determining the continuance of the partnership was wrong. It was opening a matter already closed. Nothing remained after the first interlocutory decree, but to ascertain the amount of the profits made by the concern. And for this purpose the reference to the master was necessary and proper. It was not a delegation of judicial power. The master was to ascertain facts and state an account. Such an officer the court is authorized to appoint under its general power of making rules proper for the expediting of causes. 4 *Simons' Rep.* 539; *Davis* vs. *Johnson;* 4 *Russel* 247; 2 *Bligh.* 215; *Chitty Dig.* 463; 2 *Mad. Ch'y.* 483; *Dig.* 106. And if the reference should be considered by this court as irregular there is still sufficient evidence in the cause for it to decree upon as all the testimony from which Mr. Brobson stated his account is before the court. Whether, therefore, we regard this report as the statement of an officer legally authorized to make such report or not, if we can substantiate it by the evidence in the cause, this court will be equally compelled to make the same decree. Second. The issue sent to law was wrong, secondly, because it was granted after an issue had once been refused in the cause. The same interlocutory motion on the same matter cannot be repeated. 2 *Johns. Ch. Rep.* 211. An interlocutory order has the same effect as an interlocutory judgment at law; such as a judgment *quod computet.* 2 *Atk.* 303, 284, (403.) 1 *Johns. Ch. Rep.* 189; 2 *Esp. Rep.* 608. Third. If the issue was right and the partnership is to be confined to the period fixed by the jury as the time of its dissolution, the defendant is still chargeable with half the proceeds after that time, as it is proved that he continued the same business on the joint capital. If after dissolution one of the partners continue to trade on the joint stock he must account for the profits. *Gow.* 254; 17 *Vezey* 298; 15 *do.* 226, (222) 1 *Jacob & Walker* 278, *S. C.*; 2 *Russel Ch. Rep.* 325, *S. C.* Fourth. The allowance to Reybold for interest on the investment of capital was also erroneous. The business supported itself; the capital was constantly revolving and returned immediately.

We therefore ask a correction of the decree in those particulars; but not a reversal, as the decree is in our favor and there is sufficient matter here to correct it by.

*Mr. Frame,* for Reybold. First. The reference to Mr. Brobson was irregular, and the decree being founded on his report is erroneous. The chancellor has no power under the constitution and laws, nor under the usage and practice of the court to delegate to another such authority as he did in this case to Mr. Brobson. It will scarcely be controverted that judicial power cannot be delegated without express authority of law. 5 *Com. Dig. Officer, D.* 1. 2. *pp.* 135, 6. Did the chancellor delegate to Mr. Brobson any portion of the judicial power with which he is invested? Look at the decree. It commissions Brobson to do acts which properly belonged to himself. It refers to him the accounts and exceptions together with the *depositions* to take, adjust and settle an account. It authorized him to summon witnesses, take depositions, and *ascertain*

what was due from respondent to complainant. The power of making up a judgment on the facts was given to him. This is the business of the chancellor alone. It is very different from the case of directions to a mere clerk to draw up accounts. Accounts were stated already under two decrees; exceptions were filed; depositions taken; the case stood for hearing; it was actually under hearing; when it was referred to a master to determine a result; a general balance—after allowing and disallowing charges according to *his* judgment. Is this any thing less than giving him the power to *decide* the cause? It will not be denied that Brobson was appointed in this case a *master* in chancery, to perform the duties of such an officer according to the practice in England. There is such an officer known to their system; established in periods of remote antiquity. It is true the officer is appointed by the chancellor, but the office always exists and is recognized by their system. Does our constitution recognize any such officer? Does it authorize any human being to exercise judicial functions but the judges appointed according to its forms? If such an office exists here who is to fill it? The constitution says the governor shall fill all offices created or which shall be created by law, unless otherwise provided for; and if this mastership is an office known to our institutions, the governor and not the chancellor must fill it. Does the office spring out of the necessity of the case? If it does we are still brought back to the position that judicial power cannot be delegated without express law; nor, indeed, can any delegated power. Has it been established by practice? We know of no such practice and no precedent for the delegation of such power as this. There is nothing in the act of Assembly referred to that authorizes such a practice, and if it does not go to the extent of authorizing a delegation of judicial power it cannot avail them. An act to regulate proceedings *in* chancery cannot authorize the chancellor to put a case *out* of court and refer it to another's decision. In 4 *Coke's Inst.* 88, it is said that the old statutes where they speak of the chancellor's lieutenant do not mean a deputy, for the chancellor cannot appoint a deputy; but they refer to a locum tenens such as the master of the rolls. This shows the existence of the office in England from remote times as an office, for the master of the rolls is but a master in chancery. And he has judicial authority. He decides questions, and his decision binds the chancellor. His report is conclusive except under particular circumstances. Such an officer is not known to our system, nor can he be created without express legal sanction. I conclude then that the order of the 9th March, 1831, referring this cause to William P. Brobson was not within the constitutional power of the chancellor. That the master's report is without lawful warrant and irregular, and the decree which is founded upon it is erroneous and must be reversed. And even if the power delegated to Mr. Brobson had been authorized it was vitiated by the mode of its exercise. He examined Earle and other witnesses who had been examined in chief and their depositions published. Now this could not be done even before a regularly constituted master in England without special direction. 2 *Johns. Chy. Rep.* 501; *Remson* vs. *Remson; 2 Mad. Chy.* 513-14. The report then was founded on improper testimony.

Second. As to the issue. Had the chancellor the power to send an issue to law to try the duration of this partnership at the time he did send it? We affirm that he had. It is contended that the interlocutory decree of the 7 July, 1828, as affirmed on appeal closed this subject, and the chancellor had no longer any power to direct an issue. This we deny. A decree to account is always considered in our practice as merely formal; deciding nothing. The chancellor proceeds in a cause far enough to see that there is reason to call on the defendant for an account, and he directs the account reserving all power to decree in the cause as shall seem just on the coming in of the account. How little does a chancellor know of a partnership cause before the order to account! It is almost a matter of course to *begin* the cause by such an interlocutory decree. And yet we are told that it puts an end to all investigation except in the mere matter of profits. On the contrary, it decides nothing except that the complainant has made out a prima facie case entitling him to put the other party to an account in the premises; and on the filing the account all those questions of duration, extent, mutuality of interest, and amount of profit are to be considered. The first matter that arises is the extent of the partnership. This is a fact proper to be tried by a jury, and if the chancellor cannot direct an issue to inform himself on it, he will not be at liberty to get at the fact in any other way, or to know it at all. Is there any thing in the decree itself to to give it this conclusive character? (ante p. 402.) On the contrary there is an express reservation to the chancellor to make such further and *other* decree as he should deem right. On its appearing to him by the return of an issue or otherwise that the copartnership was in fact determined on another day than that to which he had directed the account to be brought up to, it was perfectly competent for him so to vary his decree. And no petition for rehearing was necessary. A petition to the chancellor to alter a decree which he expressly reserved the power to alter; to rehear an interlocutory order! I question if such a petition was ever filed; certainly never in the case of a mere interlocutory order to account. Did the affirmance on appeal make this decree any more conclusive? Not so. It but left the decree as it was—affirmed it in all respects—it *established* but did not *extend* it; confirmed it as it was but added nothing to it. 2 *Mad. Chy.* 483-4, 474, cited by Mr. Gray, refers to the rehearing, a final decree. So is 4 *Russel* 247 (2 *Bligh* ) The motion in that case for an issue was not only after final decree but on appeal and in the House of Lords. The issue in this case was not directed on our motion or on any motion, but it was ordered by the chancellor himself, for his own information. And I lay it down as an incontrovertible position, that either in England or in this state, the chancellor has the right of his own motion to direct an issue at any stage of a cause before final decree. Such an order can never be error. 2 *Mad. Chy.* 474 to 479; and the power is expressly given if not enlarged by our statute. *Digest* 103. It is here made his duty. Objections have been made to the *form* of this issue; that it involves questions of law; it is true that a partnership may be dissolved by operation of law; but the *fact* of dissolution differs from the *cause* if it and the former only was put to the jury. It is frequently difficult to strip an

issue of every thing like legal questions, but the question of an actual dissolution of a partnership is a naked fact which a jury may determine whatever may have been its cause; as by death; marriage; efflux of time; agreement and notice given, &c. &c.   2 *Campb.* 45. *Peacock* vs. *Peacock*.

Third. The chancellor erred in his final decree in *assuming* that Reybold and Dodd were *equal* partners, and thus decreeing to Dodd one half of the profits.   There is not a word of proof on this subject in the whole cause.   The answer denies it, and this is to be taken as true if there be no proof.   On this ground the decree must be reversed and the cause sent back to chancery to ascertain what interest Dodd had in the concern.

Fourth. Was Dodd entitled to a share of the profits *after* the dissolution?   I am free to admit the principle, that if, after the dissolution of a partnership, one of the partners continues the business *with the partnership property and effects,* he must account for the profits, but I deny its application to this case.   The complainant's bill and all the positions he has heretofore taken have treated this as a continuing and undissolved concern; we are now called on to account for the profits of a *closed* concern, carried on by us since the dissolution, with the joint stock.   And what proof is there that it was carried on by Reybold with the joint stock, or even with the funds of Reybold and Dodd?   There was no stock in trade, and the principle does not apply to a balance due from one partner to another arising from profits made by the concern.

Fifth. There are several minor errors of detail in the settlement of the account.   Interest on the amount found due is decreed from the time of dissolution, though many debts were outstanding and not collected till afterwards.   The chancellor refused to allow any compensation to Reybold, though it is in proof that he was the only acting person and the sole manager of the concern.   We think this a case out of the general rule.   The decree allows but $4 50 per hundred for a large lot of cattle charged in the partnership books at $5 50. These books are conclusive on the partners.   The sum of $750, paid to Fitzpatrick for his share of the profits of the concern was improperly disallowed.   The chancellor refused to deduct from the sum due to Dodd a bond from him to Reybold, Clement and Gordon. Now, though this would be no set-off at law, equity will look beyond the form of the security and ascertain Reybold's interest in this joint bond and set it off against Dodd's claim.   This court will inquire into the whole circumstances, without being bound down by the forms of security.   There is also something due from Dodd to Reybold on his individual account in the beef concern, and also on a bread account, which was a separate concern.

If, however, the court should be of opinion that this decree ought to be reversed for any of the errors in principle, the cause must be returned to chancery, where these details can be corrected.

*Mr. Bayard* and *Mr. Wales,* for Dodd's administrators. First, as to Reybold's appeal.   The chief questions are, whether the reference to Mr. Brobson was erroneous, and if erroneous, should it reverse the decree; second, whether the chancellor erred in treating Dodd as an *equal* partner.

As a general rule, judicial power cannot be delegated. Neither can legislative power. Delegatus non potest delegare. Yet the legislature had the power to appoint Mr. Hall to prepare and report bills for them, which, if they adopted, aye, even without reading, became laws. If we are asked whether a legislator who thus acts does his duty, we answer, no; but this does not affect the question of power. The court are not to decide whether the chancellor acted prudently in consulting Mr. Brobson as to the facts; he has made a decision, and whether influenced by the opinions, or aided by the researches and reports of others, is of no importance as to the validity of the decision. We do not discuss the question whether the reference to Brobson involved discretion, the exercise of judgment, or the formation of opinions; his acts and his opinions were reported to the chancellor, and by him adopted or rejected, according to his judgment. The judgment in the case is the judgment of the chancellor, and, as such, valid. We admit that if error can be shown in the account as adopted by the chancellor, it may be corrected; but it is not faulty in itself because founded on the master's report. The chancellor might consult the opinion of any lawyer on a given question or in a given case, and decree upon that opinion, and no court would reverse the decree, if it was right in itself, because founded on the opinion of another. A remarkable instance of the kind lately occurred in England. Lord Chancellor Brougham had been of counsel in a cause which afterwards came before him as chancellor. He got Lord Lyndhurst to *hear* the cause and draw up an opinion, which *he adopted* and decreed on. Masters in chancery are not judicial officers, either in England or here. They are not impeachable. They are regarded merely as the ministerial agents of the court to facilitate the business. The officer may exist without the office. There is no such office in New York, yet masters extraordinary or special are often appointed. The court has inherently the power to employ such agents. It has been the practice in the English courts from time immemorial, and our statute directs that our practice shall conform as near as may be to those courts, and such was the practice there at the formation of our constitution. It was also objected by Mr. Frame that this authority was vitiated by the mode of its exercise; and we admit his rule, that a master cannot re-examine witnesses without an order; but what is the consequence? The depositions taken without such order may be suppressed, if *excepted to.* No exceptions have been filed. But it is in truth of no consequence in this cause whether these depositions be suppressed or not. We can sustain the report and decree, so far as we are concerned, without them. An order directing an account to be taken by a master is not such a decree as is the subject of an appeal. It does not decide any matter in issue between the parties, nor otherwise conclude any of their rights; and it is only from such a decree or order that an appeal will lie. But if this reference to Mr. Brobson was irregular, and the decree should be reversed on that ground, what will be the consequence? This court must make such decree as the chancellor ought to have made; it will take up the cause at that point and make a final decree on the testimony. Throwing out the master's report as such, we will then take it up and use it as a mere statement which we can

substantiate by the proof; and if we can, the decree here must be the same.

Second. Was there error in treating Dodd as an *equal* partner? *Peacock* vs. *Peacock*, (2 *Camp*. 45) has been relied on. *It is not law*. It is a nisi prius decision, made hastily, and Lord Ellenborough would never decide so on reflection. It is against all ·the authorities. The contract of partnership is one of mutual arrangement; if no stipulations be made as to interest, or none be proved, the law implies that they are equals. The principle is, that partners take by moieties. *Gow on Partnership*, 9, 10; 16 *Vezey*, 49, 54, 5. *Lord Eldon's remarks on 2 Camp.*

The cross appeal of Dodd's administrator. We insist that the decree is erroneous, and must be varied: First, because in directing an issue to try the time when the partnership was dissolved the chancellor impugned the interlocutory decree of the 7th July, 1828. This depends on the construction of that decree. To what did it extend? The principle we assume is, that an interlocutory decree decides every thing that is necessary to be decided in order to make such decree. An account of partnership transactions was here sought; the partnership was denied; if not proved no decree to account, as between partners, could have been made, nor could it rightfully extend beyond the time such partnership existed. If Reybold was not decided to be a partner of Dodd up to the time the accounts were directed to be carried, why direct them to that time? A partnership being proved, it continues until its dissolution be shown; if there was no evidence before the chancellor on that subject, he *necessarily* decided its continuance to the time of ordering the account. Neither answer nor proof set up a dissolution; and if the answer omitted to put this matter in issue it was admitted. The decree then did decide both the existence and the continuance of the partnership, and there was no lawful mode of altering this decree, but by petition for rehearing, bill of review, or appeal. The deft. chose the last, and is now concluded forever. For though the decision on appeal simply affirms the decree below, it gives it this new property, never thereafter to be reversable by any court of inferior jurisdiction. The power of rehearing was destroyed; the fact was concluded. And this is true not only of the case, but of the principle; the court itself was bound forever by it. 4 *Simons' R.*; 15 *Vezey, Jr.* 223. An account ordered to be taken of the profits of all voyages made by a certain vessel. It appeared from plff.'s own bill that he was not entitled to a share of the profits of the *seventh* voyage. The chancellor would not allow exceptions to the charge of that voyage, but ordered the case to stand over for rehearing to correct the decree. And a rehearing is only on petitition. 2 *Mad.* 484. Issue refused as too late on appeal. The issue in this case was after appeal. And it was after a refusal of the same motion. 1 *Johns. Ch. R. Hoffman* vs. *Livingston.* And the chancellor could not do on his own motion what he could not do at the request of either party. The proper exercise of his discretion is examinable here. 4 *Russel*, 247; 1 *Johns. Ch. Rep.* 211; 2 *Mad.* 484; 1 *Har. Chy.* 454; 1 *Johns. cases*, 436, 496; 2 *Mad.* 508, 578-9, 454, 463-4, 482-3; 11 *Vezey*, 602; 15

*Vezey*, 219; 1 *Har.* 438.  Are we seriously told that the general reservation of equity in this cause enabled the chancellor to go back beyond the interlocutory decree?  That a power reserved to make further and final decrees prevents the operation and effect of past decrees?  That a right to go on with a cause includes the right to go back?  No such effect was ever given to a general reservation for further directions; it is always appended to an interlocutory decree. There may be a special equity reserved, or a special exception from the operation of a decree; but this must be specially done on the face of the decree.  As if in this case the chancellor had decreed the account without prejudice as to further enquiry into the period of continuance and time of dissolution of the partnership. The form of the issue is wrong, and this is matter of error. 4 *Russel*, 247.  The issue in this case should have been to try the fact which was alledged to have produced the dissolution; as if by its own limitation, agreement and notice; bankruptcy, or such other matter as was alledged to have produced the dissolution.  The supposed dissolution must have depended on some one among the different modes of breaking up a partnership, and this one should have been selected.  The dissolution of a partnership is a conclusion of law; the *fact* from which it was alledged to arise should have been tried on the issue.  If the issue was wrong, the decree must be varied, and Reybold charged with the profits down to the seventh July, 1828.  And afterwards, as we insist, because he continued the business on the joint funds. 17 *Vez.* 298, 307-8; 15 *Vezey*, 218, 222.

The specification of errors in the account made by Mr. Frame. First. We are entitled to interest on principles of equity. Second, Reybold not entitled to separate compensation for his services. This is not the case of a company appointing one of its members an agent. Third.  The partnership books are proved to have been falsely kept as it regards Dodd, and the chancellor properly corrected the charge made for Reybold's own beeves by the testimony.  Fourth. Fitzpatrick was not a partner with Reybold and Dodd; at least, never with Dodd's consent.  The disallowance of $750 paid him was therefore right.  A partner may give to a third person an interest in his share; but he cannot make him a joint partner.  Fifth. The bond of Reybold, Clement and Gordon, is no matter of dispute here.  The deft. by his answer never sought to set it off against Dodd's claim, and the court cannot now consider it.  We have had no opportunity to controvert it.  It is not the case of a bond due from one partner to a firm which may be always set off against that partner's share; but this is a debt alledged to be due from Dodd to Reybold, Clement and Gordon, who are strangers.  Neither the amount due upon it nor the interest which Reybold has in it can be inquired of now.  Sixth. There is nothing due on the beef or bread accounts, and the same objection applies to the latter, that it is a separate transaction with Reybold and others, not brought forward as a set-off by the answer, and therefore not inquirable into.

*Mr. Rogers*, in reply, for Reybold. Chancery has the *power*, under the general practice and our act of assembly to send an issue at any stage of the cause.  It was done by the late Chancellor Ridgely, in *Dick* vs. *Doughton*, at a very late stage of the cause; and in-

*Jeans* vs. *Kinsey*, after the cause was set down for trial an issue was asked and granted. The fact of dissolution was the proper issue to be tried. Either party could at any time have put an end to this partnership. Whether such dissolution took place was a question for a jury, and they might infer notice from circumstances. 15 *Vez. jr.* 55, 56; 17 *do.* 308-9; 19 *Johnson,* 538; 11 *Serg. & Rawle,* 46. The fact that Reybold commenced a partnership in the butchering business at the same place, and that Dodd traded with them and bought beef of them, which is proved, was a reasonable ground to induce the chancellor to doubt a longer continuance of their partnership, and was matter to be left to a jury. Did the sending the issue violate the previous interlocutory decree? These decrees have never been considered in our practice as deciding any thing finally, or putting it out of the power of the chancellor still to look into the whole cause. It was not necessary at the time this decree was made to determine the time of dissolution; any partnership entitled the complainant to a decree to account; and there was a propriety in bringing the account down to the time of ordering it, even though the dissolution was earlier. The debts and effects of the concern went over to Reybold, and were to be accounted for, and might have been properly carried into an account, at a period far beyond its termination. In *Crashaw* vs. *Collins,* 2 *Russel,* 330, the chancellor treats an interlocutory decree as deciding nothing. So 17 *Vezey,* 313-14; 2 *Atk.* 298 (286); 2 *Mad.* 476, 456, as to the equity reserved. The English rules of practice on the subject of rehearing are founded on a system of getting fees, and the same formalities are not rigidly observed in our practice. Many things are here done on motion that are there required to be done on petition; and I do not hesitate to lay it down as a general rule, that any thing in the progress of a cause may be done, according to our practice, by motion of the party, or by the chancellor of his own motion, which can be done in the English courts by petition. But this is not important, as I do not consider the decree as violated by the issue.

Is Reybold to be held accountable for profits subsequent to the dissolution on the ground of having continued the business? I do not dispute the general principle, but here was not a subsequent trading on the joint capital. No case can be produced where one partner furnishes all the capital, and all the skill, and all the attention, (which is this case) in which after a dissolution the subsequent profits have been decreed to be accounted for. The principle applies only to cases where the joint capital and joint stock are left in the business and traded on by one of the partners.

The reference to the master. It is hardly denied here that judicial power has been delegated to Mr. Brobson. It is now for this court for the first time to decide whether all the English doctrine and machinery of masters in chancery, with all its evils shall be introduced into our practice. But if we are to have the system with its evils, let us also have its checks and benefits. A master in England is a known, established and responsible person—an officer; holding an office; sitting on the bench with the chancellor and vice-chancellor. There are twelve of them in England, of whom the master of the rolls is the chief. Such an officer may be in some de-

gree a safe repository of judicial power; a very different thing from the casual appointment of any one, or no one, as a master here. Our constitution provides us with judges, and I can recognize the judicial character of none other, especially such as shall be so varying and irresponsible as these masters in chancery. If the chancellor can delegate his authority to the extent he has done it in this case there is no assigning any limits. There was but little in the cause that Mr. Brobson could not decide; and his report was taken not as the ex-official statement of a clerk, but as the report of a master giving conclusions and not merely premises. He decided that Reybold was answerable for all the debts due the concern if by due diligence he might have collected them; now was this a principle or a fact? and if a principle, was it for him or for the chancellor to establish it in reference to this case.

Compensation to Reybold for his services. I insist that the principle may be collected from the books, that where a party furnishes the capital and is the sole acting partner, there does arise an equitable claim to compensation. It may also be collected from the bill and answer in this case that such was the understanding of the parties. Dodd speaking of the compensation claimed by Reybold does not deny the propriety of the claim but only that the charge was too high.

Curia advisare vult.

*Harrington, J.* delivered the opinion of the court.

"The bill was filed in this case on the 6 July 1826, for an account of a partnership concern between the complainant, Job S. Dodd and Philip Reybold in the business of buying and butchering cattle, sheep and other stock for sale. It alledged the formation of the partnership in September 1824, and prayed a discovery and account of all the cattle, sheep and other stock bought and butchered by the deft. since that time; and of the meat, hides, tallow and other articles sold by him; and a full account of all the partnership dealings and transactions from the time of the commencement thereof; and that proper directions might be given for the conduct and management of the said joint-partnership business in future for the joint and equal benefit of the complainant and respondent.

The answer of the deft. positively denied the existence of the partnership; or that any contract of partnership between him and the complainant had ever been formed or entered into.

On the hearing of the cause the chancellor decreed (on the 7 July 1828) that Reybold should account with Dodd "for all the property, effects, rights and credits of the said concern, and of all the profits made by or on account or in behalf of the said concern, and of all transactions since the commencement of the same as afsd." and that he should on or before the 15th of October next "file an account of all the business and transactions of the said concern of Philip Reybold and Job S. Dodd, from its establishment up to the 7th day of this present month of July"—and should exhibit the true balance due to the said complainant from the said concern."

An appeal was taken from this decree; and, on hearing in the High Court of Errors and Appeals, at the June term, 1829, the decree was in all things *affirmed*.

It is contended on the part of complainant that this decree of the chancellor as affirmed in the court of appeals was conclusive, both as to the existence of the partnership and its duration: and consequently, that the issue afterwards sent by the chancellor to a court of law to try if the partnership had been dissolved, and when, was irregular.

It cannot be denied that an interlocutory decree to account is decisive of *something*. Though it has been considered by the deft.'s counsel as of very little binding importance as to the final result of the cause, it must nevertheless be admitted that as a judgment of the court upon some matter arising in the cause, it is decisive of that matter unless reversed by a superior jurisdiction or reviewed and changed by the chancellor himself. Whether it is competent to him to change or vary such an interlocutory decree without the formality of a re-hearing it is not important here to inquire, because the complainant in this cause sought relief from this decree before another tribunal whose judgment upon it was conclusive. After affirmance in the court of appeals the interlocutory decree, whether conclusive on the chancellor before, or subject to his revision either on the general hearing of the cause or on a special petition to re-hear the matter adjudged, was certainly conclusive and binding on him.

The important inquiry therefore is, what was decided by this interlocutory decree? It decided whatever was directly in issue between the parties; whatever was necessary to be decided at that stage of the cause. Here was a controversy about a partnership;—a bill filed for an account of partnership transactions, and for payment of the complainant's share of profits. The suit embraced many and intricate questions growing out of the details of the partnership, but which it was not necessary to look into until the fact of the existence of a partnership had been established. It was denied in the answer that any contract of partnership had ever been entered into between the parties. They were at issue on this point, and this was the matter to be settled by an interlocutory decree. And this was all that was necessarily embraced in such a decree. The complainant was not entitled to an account until he established the fact of a partnership; and any contract of partnership being established a decree to account must follow whatever may have been its terms, duration or result. It was no more necessary at this stage of the cause to determine its duration than to establish its terms, or results or any other details belonging to the general consideration of the cause. Nor could the parties be supposed to be at issue on a question of *duration* of partnership when its *existence* was denied and was the matter directly in issue. On this issue the chancellor decreed an account of the partnership transactions; thereby establishing that a partnership had been entered into as alledged by the complainant and denied by the deft. but leaving all questions growing out of the account as well as all other matters not necessarily embraced in that decree, open for further and final decree. He directed that the account should commence with the origin of the partnership and be brought down to the day of making that decree; giving the widest possible range to the deft.'s accountability, but, as we apprehend, no more fixing the extent of that liability by determining the duration of the partnership, than by fixing its terms. At that time he could

know nothing about either. He had been trying whether any part-nership had been formed between the parties; he decided that it had. The partnership being thus established, prima facie it was still in existence; and, prima facie also, it was one of equal interests and equal liabilities. It was therefore proper to direct the accounts to be brought down to the date of the decree, subject however to be modified either as to the extent of the partnership or the interest of the partners, as the subsequent proof in the cause should make it necessary.

We are therefore of the opinion that the issue directed by the chancellor on the 5th of April, 1832, to try "whether or not the partnership in the business of slaughtering cattle, sheep and hogs between the said Job S. Dodd and the said Philip Reybold has been dissolved; and, if dissolved, when was the said partnership dissolved?" did not impugn the interlocutory decree of the 7 July, 1828, and was a legal and proper exercise of his power; and we are further of opinion that the form of the issue in this case is not objectionable as it submits to the jury the *fact* of the dissolution of partnership and the *period* of that dissolution which were matters proper to be tried by a jury.

We are next to inquire whether the chancellor erred in treating Reybold and Dodd as *equal* partners, and decreeing that. the deft. should pay to the complt. one half of the profits of the concern with interest from the period of its termination. We have already expressed the opinion that the interlocutory decree of the 7th July, 1828, directing Reybold to account did establish the existence of a partnership; and, in the absence of proof to the contrary, a partnership of equal interests. If a partnership exist without express agreement regulating its terms, or none such be proved, it is governed by the contract which the law implies from the relation of the parties. The law implies that they are equally interested in the joint concern; and with respect to profits, that they are entitled to an equal division unless the contrary be made to appear. (*Gow. on partnership* 10.) It is true the case of *Peacock* and *Peacock*, (*Camb.* 45) is different; but that was a nisi prius decision and has been over-ruled. In this case there is no proof whatever in relation to the interest of the partners; nor was the equality of interest denied in any stage of the cause previous to the argument on appeal. The chancellor therefore rightly treated the complt. and deft. as *equal* partners and decreed a division of profits accordingly. If the complainant was entitled to one half the profits at the dissolution of the concern he was also entitled to interest for its detention from such time as it, ought to have been paid over. The chancellor has taken the period of dissolution; and, as the evidence shows it was a cash business, or business transacted on a very short credit, with prompt payments at stated periods, a division of profits might have been made at the close of the concern. And we regard the rate of interest as a better rule of compensation for the use of complainant's capital after the dissolution than a subsequent division of profits. It is true that in certain cases where a trade or business is continued after dissolution with the joint stock and on the joint capital, the court has decreed a division of subsequent profits. In this case the capital was *created*

in the course of the business; the deft. originally advanced the whole capital on which the chancellor has allowed him interest until, according to the testimony, it was realized by the profits; on the dissolution of the partnership therefore, though the deft. did continue the same business on his separate account, it was not upon the joint stock or capital any further than that he may have had the use of so much money as he was indebted to the complainant as his share of the profits of their late partnership. Stock in trade there was none, further than this, and we are of opinion that the complainant is not entitled, on the authority of the cases referred to, to treat this partnership as subsisting and being carried on by Reybold after its dissolution for the equal benefit of them both merely because his share of the profits was not promptly paid over. We think the more equitable rule is that adopted by the chancellor of giving him interest for the use of his money from the time Reybold ought to have paid it.

It is also objected against the decree of the chancellor that he re-refused to allow Reybold any compensation for his attention to the business of the concern though it is in proof that the whole was transacted by him without any interference or attention on the part of Dodd. The chancellor has but followed the rule of law on this subject: though the management of the business might reasonably entitle Mr. Reybold to compensation, such management is deemed to be voluntary, without a special agreement, and gives no legal claim to compensation. Each joint owner in managing a joint concern is taking care of his own interests, and the law never undertakes to settle between partners their various and unequal services bestowed on the joint business. This must be left to contract (1 *Johns. Ch'y. Rep.* 165. *Franklin* vs. *Robinson.*) In the case of joint partners the general rule is, that one is not entitled to charge against another a compensation for his more valuable or unequal services bestowed on the common concern without a special agreement. (3 *Johns. Ch'y. Rep.* 434. *Bradford* vs. *Kimberly,* and the cases there cited.) It is true that where the other partners constitute one the agent of the whole to transact the whole business he is entitled to compensation, either stipulated or on a quantum meruit; but this is on the ground of contract. Without express agreement for compensation to a joint owner or partner, or the positive employment of one of the partners by the others for the transaction of the concerns of the whole and as the agent of the whole, no compensation can be allowed on the authority of adjudged cases. In this case there does not exist any proof of such contract for compensation, nor of the employment of Mr. Reybold as the agent of the concern for the transaction of the whole business; and though it may have been conducted chiefly or entirely under his supervision and care, the attention thus bestowed was voluntary on his part and *given* to the concern. For the use of his buildings, slaughter houses, pastures, &c. and for actual expenses incurred by him in managing and conducting the affairs of the partnership allowance has been made.

We have yet to consider what we regard as the most important question in this cause. On this question the court is divided, and the opinion now to be expressed is that of a majority of the court only.

"The fourth exception or cause of appeal in this cause assigns as matter of error in the decree." That it appears that the said decree was based on the report made in this cause by a certain William P. Brobson, esquire, whereas the defendant does insist that judicial power cannot be delegated but by express law, and that the most important rights and privileges of the deft. in the cause were by order of the chancellor examined and adjudicated out of court by the said William P. Brobson, esquire. It is at once seen that this exception involves a very important question, and that is, whether the chancellor has the power to appoint a person by the name of a master in chancery, auditor or referee to state an account and to take depositions in support of the account which may be so stated. It is admitted that no such power has been delegated to him by any statute law of this state, although the legislature has deemed it proper to confer upon him full power to hear and decree all such matters and causes of equity as shall come before him, where the proceedings shall be as heretofore, by bill and answer; and with power to issue forth all manner of subpœnas and all other process as may be needful to oblige and force defts. to answer suits; and also to award commissions for taking answers and examining witnesses, and to grant injunctions for staying suits at law and stopping wastes, as there may be occasion; with power to make orders and do all other things necessary for bringing causes to hearing; and that when matters of fact shall happen to arise upon the examination or hearing of the matters and causes to be heard and determined in the said court, then and in every such case to order the matter of fact to issue and trial at law before decree. As there is no such power to be found in our acts of assembly then can it be sustained by the ancient practice of the court of chancery in England, adopted there previous to the settlement of this country, or by any uniform and settled practice in this state. In England there are what are called masters in chancery. They are in number twelve including the master of the rolls, all of whom so late as the reign of queen Elizabeth were commonly doctors of the civil law; and *Blackstone 3 vol.* 442 calls them "officers of the court." And it is said that some sit in court every day during term, and have referred to them interlocutory orders for stating accounts, computing damages and the like, and they also administer oaths, take affidavits and acknowledgments of deeds and recognizances. They are appointed by the lord chancellor and hold their office for life, and they have a fixed salary paid them from the public treasury. No stress can be laid on their being appointed by the lord chancellor, for he has the appointment of various other officers unconnected with his court. Here no such power is given to the chancellor, either by the constitution or by statute. It cannot have been derived from practice for it is believed not to have been before exercised except by the consent of the parties to the suit. During the long period in which chancellors Killen and Ridgely performed the duties of that office it does not appear that either of them ever made such an appointment. It is true that the record in one case does not show that the consent of the parties was obtained, but the recollection of the counsel in that case is that the parties expressly consented to the appointment. Whether the chancellor has such a power or not is

highly important to suitors.    The policy of the state has been to administer justice at its own expense, by persons appointed by the state, and acting under the sanction of an oath and amenable to the state for corruption and mal practices; whereas if it be permitted the chancellor to appoint a master *ad litem* the whole expense necessarily falls upon the parties to the suit; you have not the security of an oath, nor is he responsible to any one for misconduct.    Should the business of the court of chancery become too laborious for one man to perform, the remedy is plain;—authorize by law the appointment of a master in each county who shall act in *all* cases coming within his province; let him receive a salary from the state, and be bound by an oath to discharge the duties of his office with fidelity, and be liable to indictment, or impeachment for misbehavior.    Had the chancellor attempted to appoint a master for each county and with all the powers incident to the office every one would have been startled at this stretch of power, and no one would have hesitated to deny it to him.    If he cannot do this, and no one is hardy enough to say he can, whence does he derive the power to appoint one *ad litem?*  Not by the constitution, not by any statute, nor by long established usage.    It would be better, infinitely better, that he should have the general power of appointing an officer to act in all cases, than that he should have the power of appointing him in the particular suit; for in the latter instance, if he were a corrupt man, he might appoint one to do the work of which he might be ashamed.

If the chancellor can rightfully appoint a master, he must necessarily have all the powers incident to the office.    It seemed to be the opinion of the counsel for the deft. in this appeal, that the powers of a master were very limited; that it was a mere ministerial office, and that he could not decide any question of law.    *Newland,* in his *Chancery Practice,* enumerates many of the various functions of a master.    He says, pp. 6 and 7—"It would be impossible to specify every head of reference, because they are almost as numerous as the matters subject to the jurisdiction of the court; but the following is a statement of such as usually occur:   To examine into any alledged impertinence or scandal in any bill or answer, or into the sufficiency of any answer or examination; to examine into the regularity of proceedings had in court; into all alledged contempts of the court; to settle interrogatories for the examination of the parties; to take the accounts of executors, administrators, trustees and guardians, and between parties of every description; to inquire into and decide upon claims of creditors and legatees and next of kin; to appoint receivers of personal estates and of the rents of real estates, fix their salaries, and examine their accounts; to inquire as to repairs to be done, and into the propriety of felling timber and granting leases; to sell estates, and to approve of the investment of trust money in the purchase of estates, and for this purpose to inquire into their value, to investigate the title to them, and settle the conveyances; to inquire for the heirs and next of kin of persons dying intestate; to appoint committees of the persons and estates of lunatics, and to examine the accounts of such committees.    *And in general there is no question of law or equity, or disputed fact, which a master may not have occasion to decide, or respecting which he may not be called upon to report*

53

*his opinion to the court.*" If the chancellor can appoint a master, and refer one of these matters to him for decision, what is to prevent him from referring all or any of them? Do the necessities of the state require that the chancellor should be authorized to delegate so many of his powers? It is a maxim, that judicial powers cannot be delegated unless by *express* warrant of law; and we would ask, where is this express warrant? We find it neither in the constitution nor statutes of the state, nor is it even warranted by the practice and usages of the court. The reason assigned in 2 *Vez.* 388 why matters of account and other matters are referred to a master is this—— "that whenever an account is to be taken, the court, by its *ancient constitution*, is to be aided in taking it by some *proper officer*, (as masters now are,) because it is impossible to take accounts originally, *as that would so take up the time of the court that justice could not be administered in other causes.*" Surely our court of chancery has not this latter excuse for delegating its authority to a master. The terms rarely exceed a week, and are held but twice a year.

It was said at the bar, that if the chancellor had not the general power of appointing a master, yet in any special case of intricacy he might refer the matters to an auditor, with authority to take the account between the parties. The chancellor has in this case expressly designated him master; but we are willing to overlook that, and consider whether he can appoint an auditor without the consent of the parties. It is laid down in *Cases in Chancery* 86, that such a reference cannot be made but by the express consent of all the parties; and that even the solicitor cannot bind his client by such a reference; the client himself must consent; nor is it sufficient that the party attends on such reference unless he does actually consent. (*Ib.* 87. See also 2 *Com. Dig.* 315.) It is said in 2 *Atk.* 144, "that the house of lords very often in matters of account which are extremely perplexed and intricate, refer it to two merchants *named by the parties,* to consider the case and report their opinions upon it."

A majority of the court is therefore of opinion that there was error in the appointment of Mr. Brobson as a master in chancery in this cause, and the reference made to him under such appointment, and that the decree founded on his report is consequently errroneous, and must be reversed. I take the liberty—perhaps it is my duty—to state with deference that my own views of the subject do not accord with this opinion.

I readily assent to the proposition that judicial power cannot be delegated without express warrant of law. It was the province of the chancellor, and of the chancellor only, to adjudge and decide every matter in controversy between these parties; and it was not competent to him to transfer this power or devolve this duty upon another. But in the exercise of this power may he not employ others in the collection of facts, in the statement of accounts, or otherwise, so as to enlighten his judgment or facilitate the decision of the cause? He is authorized by law "to make all such rules and orders as may be necessary for the better regulating the practice of the court," "and all other regulations necessary for the bringing forward and expediting the hearing of causes," &c. The statement of partnership accounts may be and frequently is a matter of great labor,

requiring investigation and time which a chancellor may not have it in his power, consistently with his other public duties, to bestow upon it; and yet to a proper decision of the cause such an investigation may be necessary. Shall he not avail himself of the assistance of others in obtaining the very materials for his own judgment? And is not an order directing a clerk to state accounts and report results in such a case authorized by the act of assembly as "necessary for the bringing forward and expediting the hearing of causes?" Every such reference must to a certain extent involve the judgment of the referee; and what if it does, so that he reports to the chancellor the grounds upon which that judgment is formed. If the chancellor on such report agrees with him in opinion, he adopts his conclusions and makes them his own. I admit that the practice of thus employing the aid of others in the investigation of causes is liable to abuse; it is a power that ought to be used sparingly and with great discretion; but the power may be necessary for expediting the hearing of causes, and is in my opinion given by the act of assembly, if not inherent in the court. Let us see to what extent the aid of Mr. Brobson was employed on this occasion. Reybold had been directed to account with the complainant for all the transactions of the partnership. He had filed sundry accounts, which were excepted to, and he was directed to file other accounts, which were also excepted to. Depositions were taken and in part read, when the chancellor, finding it impossible for him to go into a detailed investigation of the accounts, made an order, on the 9th March, 1831, that the accounts and exceptions, together with the depositions, should be referred to William P. Brobson, "to take and state, settle and adjust an account between the parties, complainant and defendant, touching and concerning the concerns and business of the partnership heretofore subsisting between them;" setting forth a particular account of all the partnership transactions, engagements, debts and property, and of all profits; a specific account of all cattle, &c. bought, and of the prices; and of all beef, &c. sold; showing the profits of the concern, and the balance due complainant. And that either party should be at liberty to except to the said account, and to prove any matter in relation thereto by depositions taken in the usual form.

This order left the whole subject still under the control of the chancellor, subject to his revision and final decision. The referee, or master, as he has been called, reported the account taken by him with remarks explanatory of the principles he had adopted in stating it, and references to the testimony in support of the several items of charge or credit. Exceptions on both sides were filed, the whole subject again examined by the chancellor, with all the aid he could derive from the master's report, and he finally adopted, varied or rejected that report as in his own judgment he considered just and equitable. The decision was that of the chancellor;—influenced, it may be, we cannot tell to what extent nor how properly, by the report of the master; but still the decision of a chancellor and not of a delegated agent. It is not the case of a delegation of judicial power; nor, in my judgment, of the delegation of any authority which the law does not authorize the chancellor to devolve on another in aid of his own judicial functions.

The practice of the several chancellors in this state of employing the aid of others in stating accounts, &c. so far as there has been any such practice, is supposed not to aid the argument in favor of their authority to do so, because such practice is said to have been exercised only with the consent of parties.    No case has before occurred where it has been necessary to decide upon the power of the chancellor of his own motion to make such a reference.    For though the appointment of a master was one of the errors assigned to the decree of the chancellor in the case of *Ridgeway and Newbold* vs. *Newbold, (ante* 385*)* the point was not insisted on in the argument on appeal and did not enter into the final consideration of the case.    That case, moreover, is a very recent one, and could not establish any thing like a practice; and, according to the recollection of those who have the best as well as the most extensive knowledge of the practice, it is believed to have rested on the consent of parties.    Either by consent *or otherwise* the records of the court of chancery show that such a power has frequently been exercised, never objected to until the case of Ridgeway and Newbold, nor controverted until the present case.    In the case of *Dick* vs. *Doughten*, which was a bill for dower and arrears of dower, *(ante p.* 388*)* after a reference made by the consent of parties to three persons to ascertain the value of the arrears of dower, and after their report was set aside and the reference stricken out, when the cause came on to be heard, the chancellor, *(Ridgely,)* "after considering the same," made a decree that it be referred to James R. Black, Esq. *who for that purpose was appointed a master in chancery*, to take an account of the rents and estimate the annual value of the third part of said rents.    I have already remarked in reference to this case, while delivering the opinion of the majority on this point, that it was a reference by *consent* according to the recollection of the counsel, and I may add, of the master also; but I cannot see how the consent of parties could give the chancellor power to *appoint a master*, as he did in express terms; and if he regarded this as a mere reference by the parties themselves, it is strange that a judge of his known caution should have used language that at least implies the power of appointment without expressly founding that power on *consent*.    The same case presented an instance of a reference by consent of parties, and shows a marked difference in language between that and the chancellor's decree appointing a master.    And it is further to be remarked in that case, that the deft. was ordered to produce before Mr. Black, on oath, all deeds and other writings in his power relating to the matters in question; and authority was given to the master to examine witnesses, and his report was finally adopted and confirmed by the chancellor."

Decree.—And now to wit, &c.    It is ordered, adjudged and decreed by the court here that the order or decree of the chancellor, made in this cause in the court below, on the 9th day of March, A. D. 1831, whereby the chancellor referred the said cause, accounts, exceptions and depositions to the said William P. Brobson, together with the report of the said William P. Brobson, and the examinations, depositions, proofs and accounts made, had or taken by or before the said William P. Brobson, under and in pursuance of the

said order or decree, shall be and the same is hereby reversed, annulled and held for nothing; and it is further ordered, adjudged and decreed by the court here, that the decree of the chancellor, made in this cause on the 15th of September, A. D. 1832, and also the final decree of the chancellor, made in this cause; and also all and every the orders and decrees made by the chancellor in this cause since the said 15th day of September, in the year last aforesaid, be and the same are hereby in all things reversed, annulled and held for nothing; and it is further ordered, adjudged and decreed by the court here, that this cause and the record be remanded to the chancellor, to be proceeded in and heard before him upon the accounts, exceptions, verdict in the said feigned issue, and proofs taken and filed in this cause, save and except nevertheless that the said report, accounts, proofs and acts of the said William P. Brobson, or which were taken by or before him, the said William P. Brobson as afsd., under the afsd. order of the chancellor, referring the said cause to him as afsd. shall not be regarded and considered by the chancellor, but the same shall be taken and held for nothing; and it is further ordered and decreed by the court here, that the respondent pay costs, &c.

*Gray, Bayard* and *Wales,* for Dodd's administrator.
*Frame* and *Rogers,* for Reybold.